**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SIGMA CONSTRUCTORES, S.A.,

*Plaintiff*,

v.

REPUBLIC OF GUATEMALA,

*Defendant*.

Civil Action No. 24‑3055 (SLS)

Judge Sparkle L. Sooknanan

## <u>MEMORANDUM OPINION</u>

This case involves two treaties ratified by the United States: the U.N. Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York Convention) and the Inter-American Convention on International Commercial Arbitration (Panama Convention). Together, these treaties espouse an emphatic federal policy in favor of arbitral dispute resolution and establish an international legal regime to ensure the efficient satisfaction of arbitral awards in signatory countries. Congress has implemented both treaties in the Federal Arbitration Act (FAA).

Relying on this framework, Sigma Constructores, S.A. (Sigma), a construction and engineering company, sued the Republic of Guatemala to enforce an arbitral award that resolved a dispute between the Parties over the early termination of a highway construction contract. The arbitral award was rendered in Guatemala, which is a party to both the New York and Panama Conventions. In parallel proceedings, Guatemala is currently challenging that arbitral award in its domestic courts.

Guatemala now seeks to dismiss this action for lack of subject matter jurisdiction or personal jurisdiction under the Federal Sovereign Immunities Act (FSIA). In the alternative, Guatemala asks this Court to dismiss this action under the *forum non conveniens* doctrine or to

stay proceedings pending the ongoing judicial proceedings in Guatemala. Because none of these arguments are availing, the Court denies Guatemala's motion in its entirety. Sigma's petition falls squarely within the framework set out in the FAA and the New York and Panama Conventions. Thus, the Court is required to exercise jurisdiction in this case. And the Court expects to move expeditiously in resolving this dispute.

## BACKGROUND

### A.    Statutory Background

#### 1.    Foreign Sovereign Immunities Act (FSIA)

"For much of the Nation's history, the United States adhered to the 'classical' or 'absolute' theory of foreign sovereign immunity," where "foreign states were generally granted complete immunity from suit." *Republic of Hungary v. Simon*, 604 U.S. 115, 119 (2025) (cleaned up). "This posture reflected the venerable international law principle that states are independent sovereign entities, and it encouraged others to respect the sovereignty of the United States in their courts." *CC/Devas (Mauritius) Ltd. v. Antrix Corp.*, 605 U.S. 223, 228 (2025). But in the mid-20th Century, "an emerging consensus . . . developed among nations" favoring a "restrictive theory" of sovereign immunity, where "a foreign sovereign generally is immune from civil suit for sovereign acts but not for its commercial acts." *Simon*, 604 U.S. at 119. And in 1952, the State Department "announced the United States' decision to join the majority of other countries by adopting the 'restrictive theory' of sovereign immunity." *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 199 (2007).

"While this shift brought the United States into parity with the emerging international consensus, it also provoked tension and confusion." *Antrix*, 605 U.S. at 229. Courts "relied heavily upon the advice of [the Executive] branch when deciding just when and how th[e] 'restrictive' sovereign immunity doctrine applied." *Bolivarian Republic of Venezuela v. Helmerich & Payne*

*Int'l Drilling Co.*, 581 U.S. 170, 180 (2017). But "[f]oreign nations often placed diplomatic pressure on the State Department, and, on occasion, political considerations led to suggestions of immunity in cases where immunity would not have been available. Furthermore, in instances where the State Department simply failed to file any suggestion, courts were forced to determine immunity based on standards that were neither clear nor uniformly applied." *Antrix*, 605 U.S. at 229 (cleaned up).

"Congress addressed the problem in 1976 by enacting the FSIA[.]" *Id.* That statute "codif[ied] . . . international law at the time of [its] enactment" by statutorily adopting the "restrictive view of sovereign immunity." *Permanent Mission*, 551 U.S. at 199. "Instead of case-by-case determinations that were governed by fuzzy legal standards and prone to manipulation, the FSIA imposes a bright-line rule: foreign states and their instrumentalities are immune from suit unless one of the Act's enumerated exceptions applies." *Antrix*, 605 U.S. at 229. "The Act for the most part embodies basic principles of international law long followed both in the United States and elsewhere," *Helmerich & Payne Int'l Drilling*, 581 U.S. at 179, and serves as "the sole basis for obtaining jurisdiction over a foreign state in our courts," *Antrix*, 605 U.S. at 229 (citation omitted).

### 2.    New York Convention

The New York Convention is a multinational treaty that seeks "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974). The New York Convention was designed to replace and succeed the preceding League of Nations Geneva Convention on the Execution of Foreign Arbitral Awards, Sep. 26, 1927, 92 L.N.T.S. 301

(Geneva Convention). *See* Charles H. Sullivan, *1958 Report of the U.S. Delegation to the United Nations Conference on International Commercial Arbitration*, Office of the Legal Advisor U.S. Department of State, *reprinted in* 19 Am. Rev. Int'l Arb. 91, 94 (2008) (*1958 State Department Delegation Report*).

Specifically, the New York Convention sought to eliminate hurdles to the confirmation and enforcement of arbitral awards in light of concerns that "[t]he continuing expansion of world trade and the acceleration of the commercial process had . . . caused the business community to regard the provisions of the [Geneva] Convention as inadequate." United Nations Conference on International Commercial Arbitration, *Summary Record of the First Meeting* 3–4, U.N. Doc. E/CONF.26/SR.1 (Sep. 12, 1958). "The primary defect of the Geneva Convention was that it required an award first to be recognized in the rendering state before it could be enforced abroad, the so-called requirement of 'double exequatur.'" *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 22 (2d Cir. 1997) (citation omitted). So a party needed the "court of the country of origin" to either render a judgment or otherwise "give leave" in order "to allow enforcement" of the arbitral award elsewhere. *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 367 n.41 (5th Cir. 2003). "This requirement was an unnecessary time-consuming hurdle, and greatly limited the Geneva Convention's utility." *Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 22 (cleaned up). The Geneva Convention also "placed the burden of proof on the party seeking enforcement of a foreign arbitral award and did not circumscribe the range of available defenses to those enumerated in the convention." *Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier*, 508 F.2d 969, 973 (2d Cir. 1974).

The New York Convention resolved these issues. Most importantly, it "eliminate[d]" the requirement of "double exequatur" altogether. *1958 State Department Delegation Report*, 19 Am.

Rev. Int'l Arb. at 108–09 (explaining the requirement was replaced with a system where "in most cases an award . . . become[s] susceptible of enforcement without some kind of judicial confirmation"). It "requir[ed] rewards to be [only] 'binding' on the parties rather than 'final[,]'" as was required under the Geneva Convention, "for enforcement to occur in a court of secondary jurisdiction." *Karaha Bodas*, 335 F.3d at 367 n.41. The treaty thus "enabl[ed] parties to enforce [arbitral awards] in third countries without first having to obtain either confirmation of such awards or leave to enforce them from a court in the country of the arbitral situs." *Id.* at 366–67. And it "shifted the burden of proof to the party defending against enforcement and limit[ing] . . . defenses to [those] set forth in [the Convention]." *Parsons & Whittemore Overseas*, 508 F.2d at 973.

"In so doing, the Convention intentionally liberalized procedures for enforcing foreign arbitral awards," *Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 22 (cleaned up), and established a "general pro-enforcement bias" of arbitration agreements, *China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.*, 334 F.3d 274, 283 (3d Cir. 2003) (quoting *Parsons & Whittemore Overseas*, 508 F.2d at 973). The New York Convention thus transformed international law by prohibiting State Parties from "declin[ing] enforcement of such agreements on the basis of parochial views of their desirability or in a manner that would diminish the mutually binding nature of the agreements." *GE Energy Power Conversion France SAS, v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 433 (2020) (quoting *Scherk*, 417 U.S. at 520 n.15).

### 3.     Panama Convention

The Panama Convention is a regional arbitration treaty among members of the Organization of American States (OAS). Inter-American Convention on International Commercial Arbitration, *opened for signature* Jan. 30, 1975, O.A.S.T.S. No. 42, 1438 U.N.T.S. 245 (Panama Convention). At the time of the treaty's adoption, many OAS Member States had not adopted the

New York Convention. *House Report on Bill (H.R. 4314) to implement the Inter–American Convention on International Commercial Arbitration*, H.R. Rep. 101-501, 4–5, 1990 U.S.C.C.A.N. 675, 677 (House Report). So the Panama Convention was "modeled after" the New York Convention using similar language "intended to achieve the same results." *Id.* at 676, 678; *see also* Presidential Message to the Senate Transmitting the Inter-American Convention on Commercial Arbitration, Pub. Papers (June 15, 1981), available at: https://perma.cc/8RJ2-B6MD. The Panama Convention was widely "adopted upon the insistence of the [United States]" and led formerly "reluctant" OAS Member States "to accept the efficient rules of the New York Convention." Jan Kleinheisterkamp, *Recognition and Enforcement of Foreign Arbitral Awards* ¶ 18, *in* Max Planck Encyclopedia of Public International Law (2008) (MPEPIL). Ultimately, the treaty became largely redundant as many of these States, upon seeing the success of the Panama Convention, adopted the New York Convention as well. *Id.* And legislators expected that "courts in the United States would achieve a general uniformity of results under the two conventions." House Report at 678.

Because the provisions of the New York and Panama Convention are in large part "substantively identical," *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 933 (D.C. Cir. 2007), "authority interpreting one [treaty] may be applied to the other," *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 40 F.4th 56, 62 n.2 (2d Cir. 2022).[1] Here, the Parties agree

---

[1] *See also Compania de Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 58 F.4th 429, 447 (10th Cir. 2023) ("Courts interpret the New York and Panama Conventions interchangeably because there is no substantive difference between the two conventions and the defenses under each are the same." (cleaned up)); *Corporacion AIC, SA v. Hidroelectrica Santa Rita S.A.*, 66 F.4th 876, 889 (11th Cir. 2023) (en banc) (enforcement and recognition provisions are "substantively identical"); *Vantage Deepwater Co. v. Petrobras Am., Inc.*, 966 F.3d 361, 370 (5th Cir. 2020) (same); *Int'l Ins. Co. v. Caja Nacional De Ahorro y Seguro*, 293 F.3d 392, 396 n.9 (7th Cir. 2002) (same).

that the relevant standards under either treaty are "substantively identical" for purposes of this motion. Mot. 16 n.9; Opp'n 24 n.8. Thus, the Court will refer to "the Convention" when referring to obligations under both treaties. *See TermoRio*, 487 F.3d at 933 (using a similar approach).

### B.    Factual Background

Sigma is a construction company incorporated in Guatemala. Pet. 1, ECF No. 1. On November 7, 2014, Sigma and Guatemala entered into a contract for the construction of about 100 kilometers of public highways. Pet. ¶ 2. The contract included, in relevant part, a provision for contractual disputes to be resolved through binding arbitration "in accordance with the laws of the Republic of Guatemala" and with a resulting arbitral award that "will not be subject to any challenge." Pet. Ex. F at 35, ECF No. 1-7. In November 2017, three years later, Guatemala unilaterally terminated this contract and offered Sigma about $ 4.6 million in compensation. Pet. ¶¶ 12–13. Sigma disputed Guatemala's valuation and initiated an arbitration proceeding for damages arising from the early termination. Pet. 15. The arbitration took place in Guatemala, and the tribunal ruled for Sigma on October 27, 2021, awarding over $ 37 million in damages alongside post-judgment interest. Award ¶¶ 121–28, ECF No. 19-2.

In December 2021, Guatemala filed a *Recurso de Revisión* action in the Guatemalan Second Civil Superior Court of Appeals (Court of Appeals) to set aside the arbitral award. *See* Confirmation Judgment, Pet. Ex. H, ECF No. 1-9. In such a proceeding, a party may seek to "confirm, revoke, or modify the arbitral award." Mot. Ex. N, Art. 43(1), ECF No. 15-28. There, Guatemala argued that the arbitration tribunal erred by failing to stay arbitral proceedings while Guatemala was conducting a criminal investigation into potential bribery by Sigma and thereby could not publicly disclose allegedly relevant documents for its defense. *See* Guatemala Attorney General's Submission Dated December 12, 2021 (English Translation), ECF No. 15-22. In

October 2022, the Court of Appeals rejected this argument and issued a judgment confirming the arbitral award. *See* Confirmation Judgment, ECF No. 1-9.

Throughout the Court of Appeals proceedings and after the Confirmation Judgment, Guatemala filed both interlocutory and post-judgment *Amparo* actions before the Guatemala Supreme Court, a higher appellate court. *See* Pineda Decl. ¶ 5, ECF No. 15-1. An *Amparo* is a "writ for constitutional protection" where the petitioner "alleges violations of the Guatemalan Constitution." *Id.* ¶ 4; *see also* First Barrios Decl. ¶ 9, ECF No. 20. The Parties dispute whether an *Amparo* acts more as an appeal or a collateral attack. *Compare* Opp'n 9, *with* Reply 10. Regardless, the *Amparo* proceeding is the only remaining avenue by which Guatemala can get further judicial review of the Confirmation Judgment. Pineda Decl. ¶ 4.

In its *Amparo* actions, Guatemala is seeking, *inter alia*, revocation of the Confirmation Judgment and a stay of further *Revisión* proceedings during the pendency of its criminal investigation. Pineda Decl. ¶ 5; Mot. 10. Initially, the Guatemala Supreme Court denied Guatemala's request for a provisional stay of the Confirmation Judgment during the pendency of the action. Pineda Decl. ¶ 7. But Guatemala appealed this decision to the Guatemala Constitutional Court, the court of last review, which reversed the Supreme Court and granted a temporary stay of the Confirmation Judgment during the pendency of the *Amparo* proceedings. *See* Guatemala's Constitutional Court Decision dated April 22, 2022 (English Translation), ECF No. 15-7; Second Aizenstatd Decl. ¶ 18, ECF No. 19. The Parties dispute the substance of these proceedings and their relevance to the arbitral award under Guatemalan law. *See* Opp'n 7–9; Reply 6–12.

### C.    Procedural Background

On October 25, 2024, Sigma petitioned this Court to confirm the October 2021 Arbitral Award under the implementing provisions of the Convention in the FAA. Pet., ECF. No. 1.

Guatemala responded by moving to dismiss for lack of subject matter jurisdiction, lack of personal jurisdiction, and *forum non conveniens*. Mot., ECF No. 15. In the alternative, Guatemala asks that the Court stay this action during the pendency of the judicial proceedings in Guatemala. *Id.* Guatemala's motion is fully briefed and ripe for review. Opp'n, ECF No. 18; Reply, ECF No. 21.

## LEGAL STANDARD

When interpreting a treaty, courts consider the treaty's text, its "negotiating and drafting history (travaux préparatoires)[,] and the postratification understanding of the contracting parties." *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226 (1996); *see also GE Energy*, 590 U.S. at 439, 441–42. The treaty "is to be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in the light of its object and purpose." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 346 (2006) (quoting Restatement (Third) of Foreign Relations Law of the United States § 325(1) (1986)).

The New York and Panama Conventions "provide[] that signatory nations are to recognize and enforce arbitral awards rendered in other nations." *TermoRio*, 487 F.3d at 933. The United States has "acceded" to these Conventions, and Congress has "enacted implementing legislation" enforcing the Conventions in Chapters 2 and 3 of the FAA. *GE Energy*, 590 U.S. at 439; *see* 9 U.S.C. §§ 201–08 (New York Convention); *id.* §§ 301–07 (Panama Convention). Under the FAA, courts consider petitions to confirm arbitral awards "in the manner provided by law for the making and hearing of motions." 9 U.S.C. § 6; *see also id.* §§ 208, 307. So a petition is not held to the standards of "notice pleading" and proceedings "will take the form of a summary procedure in the nature of federal motion practice." *TermoRio*, 487 F.3d at 933.

"[A] foreign sovereign may elect to defend confirmation proceedings in two phases." *Deutsche Telekom, A.G. v. Republic of India*, 155 F.4th 694, 698 (D.C. Cir. 2025). First, the

sovereign can contest jurisdiction through a motion. *Id.* "Second, if those efforts fail, sovereigns may then raise merits defenses under the . . . Convention." *Id.*

To exercise "jurisdiction over an action seeking to enforce a foreign arbitral award against a foreign sovereign, the Court must satisfy itself of two requirements." *Sigma Constructores, S.A. v. Republic of Guatemala*, No. 22-sc-1674, 2025 WL 485403, at *2 (D.D.C. Feb. 13, 2025), *report and recommendation adopted*, No. 22-cv-1674, 2025 WL 3563185 (D.D.C. Dec. 12, 2025). "First, there must be a basis upon which a court in the United States may enforce a foreign arbitral award; and second, [Guatemala] must not enjoy sovereign immunity from such an enforcement action." *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 121 (D.C. Cir. 1999). Because "[t]he FAA provides a cause of action to confirm foreign arbitral awards," jurisdiction largely turns on the second prong—immunity. *Deutsche Telekom*, 155 F.4th at 697. "Whenever an FSIA immunity exception applies, jurisdiction usually follows." *Antrix*, 605 U.S. at 230.

On the merits, courts "may refuse to enforce the award only on the grounds explicitly set forth" in the Convention. *TermoRio*, 487 F.3d at 935. Because "the New York Convention provides only several narrow circumstances when a court may deny confirmation of an arbitral award, confirmation proceedings are generally summary in nature." *BCB Holdings Ltd. v. Gov't of Belize*, 110 F. Supp. 3d 233, 247 (D.D.C. 2015) (citation omitted). "The burden of establishing the requisite factual predicate to deny confirmation of an arbitral award rests with the party resisting confirmation, and the showing required to avoid summary confirmation is high." *Id.* (cleaned up).

## DISCUSSION

Guatemala moves to dismiss for lack of subject matter jurisdiction, lack of personal jurisdiction, and *forum non conveniens*. Guatemala alternatively requests a stay of the proceedings pending the judicial proceedings in Guatemala should this Court decline to dismiss. The Court first

addresses jurisdiction and finds that the FSIA arbitration exception grants this Court both subject-matter and personal jurisdiction to consider Sigma's enforcement action. The Court declines to exercise its discretion to grant a stay at this time because one is not warranted at such an early stage of the confirmation proceedings. The Court also declines to apply the *forum non conveniens* doctrine because it is unavailable in this Circuit for actions arising under the Convention.

## A.    Subject-Matter and Personal Jurisdiction

A court has subject matter and personal jurisdiction over a foreign sovereign whenever an FSIA immunity exception applies and process is served. *Antrix*, 605 U.S. at 233 (citing Restatement (Fourth) of Foreign Relations Law of the United States § 451, comment b (2018); and then citing *GSS Group Ltd. v. National Port Auth.*, 680 F.3d 805, 811 (D.C. Cir. 2012)). Guatemala was served in this proceeding. Status Report, ECF No. 11. But Guatemala contests the applicability of the FSIA exceptions and moves to dismiss the Petition under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction and under Rule 12(b)(2) for lack of personal jurisdiction. Mot. 12. Since a confirmation petition is not a pleading, the defenses in Rule 12(b) are unavailable, but this does not bar "the filing of defense motions" on jurisdictional grounds. *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 962 F.3d 576, 585 (D.C. Cir. 2020). Federal Rule of Civil Procedure 7(b) permits parties to file written motions "stat[ing] the relief sought" and "the grounds for seeking the order." Fed. R. Civ. P. 7(b). The Court thus construes Guatemala's Rule 12(b) motion as "a proper motion under Rule 7(b)" and proceeds to address the jurisdictional questions. *Process & Indus. Devs.*, 962 F.3d at 585.

Sigma argues that this Court has jurisdiction under the FSIA's arbitration exception, 28 U.S.C. § 1605(a)(6). Opp'n 15–21. The Court agrees.[2]

The FSIA arbitration exception waives a foreign sovereign's immunity when:

> the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a *subject matter capable of settlement by arbitration under the laws of the United States*, or to confirm an award made pursuant to such an agreement to arbitrate, if (A) the arbitration takes place or is intended to take place in the United States, (B) *the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards*, (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or (D) paragraph (1) of this subsection is otherwise applicable.

28 U.S.C. § 1605(a)(6) (emphases added). The Parties dispute whether Sigma's confirmation action implicates "the laws of the United States." Mot. 2. Because Sigma's arbitration is governed by the Convention, this enforcement action undoubtedly concerns "subject matter capable of settlement by arbitration under the laws of the United States." 28 U.S.C. § 1605(a)(6). The arbitration exception thus vests this Court with jurisdiction.

The United States is a party to both the New York and Panama Conventions on commercial arbitration. And "[t]reaties made under the authority of the United States are part of the laws of the United States[.]" Restatement (Fourth) of Foreign Relations Law § 301(1) (2018).[3] Indeed, the

---

[2] Sigma also argues that the Court has jurisdiction under the FSIA's implied waiver exception. *id.* 28 U.S.C. § 1605(a)(1). Because the Court concludes that the FSIA arbitration exception applies, it need not address whether the implied waiver exception applies.

[3] *See Jogi v. Voges*, 480 F.3d 822, 827 (7th Cir. 2007) (holding a treaty is "part of the law of the United States" as that term is used in 42 U.S.C. § 1983); *Lidas, Inc. v. United States*, 238 F.3d 1076, 1081 (9th Cir. 2001) ("Upon its ratification, [a] [t]reaty bec[o]me[s] part of the law of the United States."); *Retfalvi v. United States*, 930 F.3d 600, 611 (4th Cir. 2019) (same); *United States v. Stuart*, 489 U.S. 353, 375 (1989) (Scalia, J., concurring) (recognizing treaties and interpretations thereof are part of "the law of the United States"); *Zicherman v. Korean Air Lines Co.*, 516 U.S.

FAA specifically provides that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws . . . of the United States." 9 U.S.C. § 203 (New York Convention); *see also id.* § 302 (Panama Convention). It follows then, that any subject matter capable of arbitration under the Convention as ratified by the United States is also capable of arbitration "under the laws of the United States." 28 U.S.C. § 1605(a)(6).

Guatemala resists this straightforward conclusion. It says that this action does not concern any "subject matter capable of settlement by arbitration under the laws of the United States" because, on Guatemala's reading, the FAA's general arbitration provisions in Chapter 1 (specifically Section 2) do not apply.[4] Mot. 13. But even if this were true, it would make little difference. Chapter 1 of the FAA does not preclude arbitrability when the Convention, as ratified

---

217, 226 (1996) ("[A] treaty ratified by the United States is . . . the law of this land." (citing U.S. Const., art. II, § 2)); *Sosa v. Álvarez–Machain*, 542 U.S. 692, 729 (2004) ("For two centuries we have affirmed that the domestic law of the United States recognizes the law of nations."). There is some dispute about whether non-self-executing treaties that lack implementing legislation by Congress are considered law of the United States since they are not given full effect by courts. *See Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872, 879–81 (D.C. Cir. 2006) (Kavanaugh, J., concurring) (discussing differing views across courts); *see also Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 254 (1829) (Marshall, C.J.) ("Our constitution declares a treaty to be the law of the land. It is consequently to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provision."). But such uncertainty does not extend to the New York Convention. Various circuits have held that provisions of the New York Convention are self-executing. *See Certain Underwriters at Lloyds, London v. 3131 Veterans Blvd, LLC*, 136 F.4th 404 (2d Cir. 2025); *Green Enters., LLC v. Hiscox Syndicates Ltd. at Lloyd's of London*, 68 F.4th 662, 666–68 (1st Cir. 2023); *CLMS Mgmt. Servs. Ltd. P'ship v. Amwins Brokerage of Georgia*, LLC, 8 F.4th 1007, 1012–16 (9th Cir. 2021); *Safety Nat. Cas. Corp. v. Certain Underwriters at Lloyd's, London*, 587 F.3d 714, 732–37 (5th Cir. 2009) (Clement, J., concurring). And, more importantly, Congress has enacted legislation implementing the treaty as "law . . . of the United States." 9 U.S.C. § 203; *see also GE Energy Power Conversion France SAS v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 439 (2020) ("In 1970, the United States acceded to the New York Convention, and Congress enacted implementing legislation in Chapter 2 of the FAA."). Undoubtedly, even under the most restrictive view, the New York Convention is then the law of the United States. *See Kempthorne*, 472 F.3d at 879 (Kavanaugh, J., concurring).

[4] Chapter 1 of the FAA includes general provisions regarding arbitration. Section 2 of Chapter 1 governs the validity, irrevocability, and enforcement of agreements to arbitrate. 9 U.S.C. § 2.

by the United States, provides for arbitration. In these circumstances, the subject matter is capable of arbitration instead under Chapter 2 of the FAA, which implements the New York Convention, or Chapter 3 of the FAA, which implements the Panama Convention. Chapter 1 only applies to the extent it is not "in conflict" with "the Convention as ratified by the United States." 9 U.S.C. § 208 (New York Convention); *id.* § 307 (Panama Convention). Thus, the FAA expressly provides that Section 2, the provision upon which Guatemala rests, is superseded by the treaty's implementing provisions, *see Zhongshan Fucheng Indus. Inv. Co. LTD v. Fed. Republic of Nigeria*, 112 F.4th 1054, 1074 (D.C. Cir. 2024) (discussing relationship between Chapter 1 of the FAA and § 208), which themselves constitute "the laws . . . of the United States," 9 U.S.C. § 203.

Here, neither party contests that Sigma's enforcement action "fall[s] under the Convention." 9 U.S.C. § 203; *see* Reply 4–5 (expressly declining to make this argument). And "the place of the award" is Guatemala, a party to both treaties, so this Court is "required to recognize and enforce the award" under both the Convention and its implementing statutes. *TermoRio*, 487 F.3d at 934. So Chapter 1 cannot be a basis to instead "artificially and extra-textually confine," *Zhongshan Fucheng*, 112 F.4th at 1064, arbitral subject matter that otherwise falls within the Convention's scope, *see* 9 U.S.C. §§ 208, 307. Although the statute's plain text alone is enough to discard Guatemala's "proposed reading," *Zhongshan Fucheng*, 112 F.4th at 1074, the Court addresses Guatemala's "context and purpose" arguments as well. Reply 5.

*First*, Guatemala argues that its reading is supported by the "purpose" and "structure" of the statute. Mot. 14. But the Court disagrees on both fronts. Rather, the statute's purpose and structure suggest that "the New York Convention is exactly the sort of treaty Congress intended to include in the arbitration exception." *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 27 F.4th 771, 776 (D.C. Cir. 2022) (cleaned up).

Prior to the enactment of the arbitration exception, 28 U.S.C. § 1605(a)(6), courts most commonly enforced New York Convention awards under the FSIA's "implied-waiver" exception in § 1605(a)(1). Restatement (Third) U.S. Law of Int'l Comm. Arb. § 4.26, rep. note a(i) (2023) (the Restatement). The legislative history of the FSIA suggests that Congress considered the implied waiver exception satisfied "where a foreign state has agreed to arbitration in another country." H.R. Rep. 94-1487, at 18, *reprinted in* 1976 U.S.C.C.A.N. 6604, 6617 (Sep. 9, 1976). But whether ratifying the New York Convention and signing an arbitration agreement constitutes an implied waiver of sovereign immunity remained and still remains an "unsettled" area of law in courts. *Process & Indus. Devs.*, 27 F.4th at 774; *compare Creighton*, 181 F.3d at 122–23 (declining to endorse the view that a State always waives immunity when signing an arbitration agreement but recognizing that a State Party to the New York Convention implicitly waives immunity when it signs such an agreement), *with Zhongshan Fucheng*, 112 F.4th at 1075–88 (Katsas, J., dissenting) (suggesting the New York Convention does not implicitly waive sovereign immunity based on its terms and the travaux préparatoires).

In 1986, Congress began to consider legislation to "give more explicit guidance to judges in dealing with these issues," 132 Cong. Rec. S28000 (Oct. 2, 1986) (statement of Sen. Lugar), by expressly "preventing a foreign government from invoking the sovereign immunity defense to escape enforcement of an arbitral award," 132 Cong. Rec. S33742 (Oct. 18, 1986) (statement of Sen. Mathias). The State Department endorsed the implied waiver view and encouraged legislation to ensure "that arbitral awards rendered under the New York Convention shall be enforceable notwithstanding sovereign immunity" and "clarify the law that is emerging" to that effect "from a body of cases on implicit waiver[.]" *Arbitral Awards: Hearing Before the Subcommittee on Administrative Law & Governmental Relations of the Committee on the Judiciary*, 99th Cong., 2d

Sess. 25, 32–33 (1986) (statement of Elizabeth G. Verville, Acting Legal Adviser Department of State). The Department also called for such legislation to "be codified in the FSIA." *Id.* at 33.

Congress followed suit and enacted the arbitration exception, 28 U.S.C. § 1605(a)(6), into the FSIA in 1988. Restatement (Third) U.S. Law of Int'l Comm. Arb. § 4.26, rep. note a(i) (2023). The stated purpose of the amendment was to ensure that "the doctrine of sovereign immunity" would not "be used to frustrate the effect on an agreement to arbitrate or to interfere with the enforcement of an arbitral award entered against a foreign state." 134 Cong. Rec. H.R. 32328 (Oct. 20, 1988) (statement of Rep. Moorhead); *see also Foreign Sovereign Immunities Act: Hearing Before the Subcommittee on Administrative Law and Governmental Relations of the House Judiciary Committee on H.R. 1149, H.R. 1689, and H.R. 1888,* 100th Cong., 1st Sess. 11 (1987) (Rep. Fisch introduced the bill to prevent "use of . . . the sovereign immunity defense to avoid compliance with an otherwise valid arbitration award."). So Guatemala's reliance on statutory purpose to instead circumvent enforcement of an arbitral award is unavailing.

The structure of the statutory scheme also does not support Guatemala's reading. The arbitration exception was passed as part of a larger statute that also provided for the attachment or execution of the property of a foreign state through "[a] judgment [that] is based on an order confirming an arbitral award rendered against the foreign state." Pub. L. 100–669, § 3; 102 Stat 3969 (1988), *codified at* 28 U.S.C. § 1610(a)(6). That statute also amended the FAA to remove the "Act of State" defense, which can only be invoked by sovereign States, in actions confirming arbitral awards. Pub. L. 100–669, § 1; 102 Stat 3969 (1988), *codified at* 9 U.S.C. § 15. This statutory structure also suggests that Congress enacted the arbitration exception to better effectuate rather than limit the enforcement of arbitral awards against foreign sovereigns.

16

*Second*, Guatemala argues that its reading is supported by the presumption against extraterritoriality. Mot. 14. That presumption limits the scope of "legislation of Congress" to preclude "exclusively foreign conduct" that is "in the territory of another sovereign" unless "a contrary intent appears" in the statute. *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 417 (2023) (cleaned up). But the presumption does not apply where "the statute gives a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 337 (2016). To make this determination, courts look to the statute's "language," "context," and "history." *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 530 (2013). Here, the Convention and its implementing legislation express a clear and unmistakable intention to apply to extraterritorial conduct, so the presumption is easily overcome.

"The FAA provides that the New York Convention is enforceable in the courts of the United States[.]" *Process & Indus. Devs.*, 27 F.4th at 773 (citing 9 U.S.C. §§ 201, 207). Since "Congress legislates with international law in mind," the statute's territorial scope is thus presumptively congruent with the United States' treaty obligations of the New York Convention. *United States v. Garcia Sota*, 948 F.3d 356, 362 (D.C. Cir. 2020); *see also Abitron Austria*, 600 U.S. at 426–27 (looking to "international law" and the underlying treaties to determine whether presumption against extraterritoriality applies to the treaties' implementing statute).[5] And the "very provisions of the [New York] Convention" provide for "enforcement actions in other signatory states." *Creighton*, 181 F.3d at 123 (cleaned up). The Convention provides that

---

[5] *See* Restatement (Fourth) of Foreign Relations Law § 309(1) (2018) ("Where fairly possible, courts in the United States will construe federal statutes to avoid a conflict with a treaty provision."); *Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*, 724 F.3d 230, 234 (D.C. Cir. 2013) ("[A]bsent some clear and overt indication from Congress, we will not construe a statute to abrogate existing international agreements[.]"); *The Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) (Marshall, C.J.) ("[A]n act of congress ought never to be construed to violate the law of nations if any other possible construction remains . . . .").

"[a]wards are enforceable in the courts of any signatory so long as 'the place of the award . . . is in the territory of a party to the Convention.'" *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 62 (D.D.C. 2015) (quoting *Creighton*, 181 F.3d at 123). Because the FAA explicitly "enforce[s]" this requirement, 9 U.S.C. § 201, the Act "unmistakably" extends to "foreign conduct" in international arbitration, *Abitron Austria*, 600 U.S. at 417-18. So the text of the New York Convention, as implemented in the FAA, expresses a clear congressional intent for judicial confirmation to have an extraterritorial sweep. *See* 9 U.S.C. §§ 201–08.

With respect to the Panama Convention, the language is even more on point. The FAA provides that "[a]rbitral decisions or awards *made in the territory of a foreign State shall . . . be recognized and enforced*" when "that State has ratified or acceded to the [Panama] Convention." 9 U.S.C. § 304 (emphasis added). The arbitral decision here was made in Guatemala, a party to the Panama Convention, so courts have been "affirmatively and unmistakably instructed that [§ 304's enforcement provision] should apply to [such] foreign conduct." *Abitron Austria*, 600 U.S. at 417–18 (cleaned up). Section 304's clear instruction to enforce Convention awards even when made "outside the United States" plainly defeats the presumption against extraterritoriality. *RJR Nabisco*, 579 U.S. at 337 (citation omitted). So Guatemala's reliance on the presumption is unavailing.

Indeed, as Guatemala itself notes, the presumption against extraterritoriality reflects the principle "that United States law governs domestically but does not rule the world." Mot. 14 (quoting *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013)). This principle has "long been enshrined in international law," *Abitron Austria*, 600 U.S. at 426, so the presumption finds its roots, among other things, in "the presumed desire of Congress to avoid violations of international law," Restatement (Fourth) of Foreign Relations Law § 404, rep. note 2 (2018). But

"a treaty ratified by the United States is not only the law of this land but also an agreement among sovereign powers" enforceable among State Parties as international law. *Zicherman*, 516 U.S. at 226 (citation omitted). So these underlying considerations provide no reason to hesitate in exercising jurisdiction here. For instance, one purpose of the presumption is "to avoid [] international discord." *Abitron Austria*, 600 U.S. at 417. But failing to enforce an international treaty is more likely to stoke rather than dampen international discord. *See Scherk*, 417 U.S. at 516–17 ("[P]arochial refusal by the courts of one country to enforce an international arbitration agreement would . . . invite unseemly and mutually destructive jockeying[.]"). This, too, weighs against applying the presumption.

*Finally*, Guatemala argues that reading the Convention to be both the "laws of the United States" and a "treaty . . . calling for the recognition and enforcement of arbitral awards" in § 1605(a)(6) violates the surplusage canon. Reply 4–5. That canon provides "that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citation omitted). Guatemala argues that if the Convention is read to be the "laws of the United States," the other language requiring the agreement or award to be governed "by a treaty" would be superfluous (and *vice versa*). Reply 4. But that is not the case. The United States has joined various treaties, including the New York and Panama Convention, with reservations that "exclude or [] modify the legal effect of certain provisions of the treaty in their application to the United States." Restatement (Fourth) of Foreign Relations Law § 305 cmt. e (2018) (cleaned up); *see also* Restatement (Third) U.S. Law of Int'l Comm. Arb. § 1.4 rep. note b(iv) (2023) (discussing the reciprocity reservations to the New York and Panama Convention); *Zhongshan Fucheng*, 112 F.4th at 1059 (discussing commercial reservation to the New York Convention). For instance,

19

"although the Panama Convention does not expressly authorize Contracting States to make a reciprocity reservation, the United States has made such a reservation and incorporated the reservation into Chapter [Three] of the FAA." Restatement (Third) U.S. Law of Int'l Comm. Arb. § 4.5 rep. note a (2023) (citing 9 U.S.C. § 304). So there are various Convention provisions that are part of the "treaty" but are not ratified or implemented as "laws of the United States." 28 U.S.C. § 1605(a)(6). Accordingly, the surplusage canon does not support Guatemala's reading.

At bottom, the "FSIA's arbitration exception" requires only "(1) an arbitration agreement, (2) an arbitral award, and (3) a treaty potentially governing confirmation." *Deutsche Telekom*, 155 F.4th at 700 (citing 28 U.S.C. § 1605(a)(6)). Here, there is (1) the arbitration provision in the construction contract between Sigma and Guatemala, (2) the Guatemalan arbitral award, and (3) "the New York Convention." *Id.* So the FSIA arbitration exception is satisfied. *See id.*

### B.    Stay

In the alternative, Guatemala asks this Court to rely on its inherent authority to stay this action pending resolution of the ongoing proceedings in Guatemala. Mot. 15–16. Although Guatemala resists the Convention's standard for a stay on the basis that this Court lacks jurisdiction to enforce that treaty, Mot. 18–19 & n.11, it argues that it nonetheless meets that standard, Mot. 20–21. Because the FAA provides that "deferral" of a Convention enforcement action should be done on grounds "specified in the said Convention," 9 U.S.C. § 207, and the Court has disposed of Guatemala's jurisdictional argument, the Court addresses the standards for a stay under both the Convention and its inherent authority. Ultimately, the Court determines that a stay is inappropriate at this stage of the proceedings. But Guatemala remains free to move for a stay again before any entry of judgment.

### 1.    Convention

A court "shall confirm" a Convention award "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207 (New York Convention); *see id.* § 302 (Panama Convention). And Article VI of the New York Convention governs efforts to "adjourn" a confirmation action, *i.e.*, to "stay or dismiss without prejudice." *Telcordia Techs., Inc. v. Telkom SA, Ltd.*, 95 F. App'x 361, 363 (D.C. Cir. 2004). The standard for a stay under Article 6 of the Panama Convention is "substantively identical for purposes of this case." *TermoRio*, 487 F.3d at 933. So the Court primarily focuses "with reference to and using the language of the New York Convention." *Id.* The New York Convention permits a court to stay proceedings when "an application for the setting aside or suspension of the award has been made to a competent authority." Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *opened for signature* June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 53 (New York Convention) art. VI. Sigma concedes that such an application exists "through Guatemala's *revisión action*" and the ongoing proceedings in Guatemala. Opp'n 23. But Sigma urges this Court not to exercise its discretion to stay.

The "permissive language" of the Convention leaves the decision to stay in the "district court's general discretion" even if a proceeding to set aside is ongoing elsewhere. *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 879 (D.C. Cir. 2021) (citation omitted). In determining whether such a stay is warranted, courts commonly balance the factors enumerated by the Second Circuit in *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 317–18 (2d Cir. 1998). *Id.* The D.C. Circuit has held that a district court abuses its discretion if it fails to at least consider the first two *Europcar* factors: (1) "the general objectives of arbitration," and (2) "the status of the

foreign proceedings and the estimated time for those proceedings to be resolved." *Id.* at 879–80

(quoting *Europcar*, 156 F.3d at 317–18). Here, the *Europcar* factors weigh against a stay.

### i.    The General Objectives of Arbitration

The First *Europcar* factor is "the general objectives of arbitration," *i.e.*, "the expeditious

resolution of disputes and the avoidance of protracted and expensive litigation." *Stileks*, 985 F.3d

at 879–80 (quoting *Europcar*, 156 F.3d at 317–18). Indeed, there is an "emphatic federal policy in

favor of arbitral dispute resolution. And at least since this Nation's accession in 1970 to the [New

York] Convention, and the implementation of the Convention in the same year by amendment of

the Federal Arbitration Act, that federal policy applies with special force in the field of

international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614,

631 (1985) (citations omitted).

Specifically, the objective of Article VI was to remove the Geneva Convention's

impediment that an award needed to be "final," Geneva Convention, art. 1; New York Convention,

art. VII(2)—*i.e.*, "an award, to obtain enforcement, must pass scrutiny first in the courts of the

country of arbitration and then in the courts of the country of enforcement," *1958 State Department

Delegation Report*, 19 Am. Rev. Int'l Arb. at 107. Instead of this system of "double exequatur,"

Article VI instead grants the "judge in the country of enforcement . . . complete latitude either to

grant an exequatur immediately, if [s]he considered that there was no reason to refuse it, or to

await the outcome of proceedings for its annulment." United Nations Conference on International

Commercial Arbitration, *Summary Record of the Eleventh Meeting* 5, U.N. Doc.

E/CONF.26/SR.11 (Sep. 18, 1958). In doing so, the Convention provides for the more "expeditious

resolution of disputes." *Stileks*, 985 F.3d at 879 (citation omitted).

Here, Guatemala spends a substantial amount of its briefing arguing that a stay should be granted simply because the arbitral award is not "final" and enforceable in Guatemala due to the pending judicial proceedings. *See, e.g.*, Mot. 2 ("[W]hile that appeals process continues, the Award is not final, so there would be nothing for this Court to confirm."). And Guatemala emphasizes that a judgment to enforce the award was stayed by the Guatemalan Constitutional Court. *See* Mot. 29 ("[T]he Constitutional Court has suspended the Confirmation Judgment such that the Award is not final and cannot be enforced in Guatemala.").

Even if this is true, lack of finality alone is not a basis to stay a Convention award. The very purpose of the New York Convention is to allow satisfaction of arbitral awards without "enforc[ing] them [in] a court in the country of the arbitral situs" and waiting for those proceedings to become "final." *Karaha Bodas*, 335 F.3d at 366–67 & n.41. So courts may "enforce an arbitral award even when nullification proceedings are occurring in the country where the award was rendered." *Compañía de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269, 1298 & n.6 (10th Cir. 2020) (quoting *Karaha Bodas*, 335 F.3d at 367) (collecting cases). And in some cases, courts "have enforced awards, or permitted their enforcement, despite prior annulment in courts of primary jurisdiction." *Karaha Bodas*, 335 F.3d at 367 & n.43 (citing *Chromalloy Aeroservices v. Arab Republic of Egypt*, 939 F. Supp. 907, 909–13 (D.D.C. 1996)). Indeed, the Convention expresses a preference for "immediate satisfaction of arbitral awards." *Gold Rsrv. Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 135 (D.D.C. 2015).

Guatemala's reliance on lack of finality is thus unavailing. The relevant question under the Convention is whether an arbitral award is "binding," not final. New York Convention, arts. III,

V(1)(e); Panama Convention, art. 5(1)(e).[6] The Parties dispute whether the award is binding. *See* Mot. 7, 17; Opp'n 28. Nevertheless, the Convention does not require courts to stay a proceeding when a party seeks confirmation of an award that has "not yet" become "binding on the parties." New York Convention, art. V(1)(e); Panama Convention, art. 5(1)(e); *see also* 9 U.S.C. § 207 (providing for "deferral" only on grounds "specified in the said Convention"). Rather, Article V calls on a court to "refuse enforcement" and "deny confirmation" when an award is not binding. Restatement (Third) U.S. Law of Int'l Comm. Arb. § 4.10(a) & rep. note a (2023). Indeed, Guatemala's own briefing concedes that if this proceeding proceeds and it prevails on this question, the proper remedy under the Convention would be to deny the petition and refuse enforcement. Mot. 19 n.12 (citing *Diag Hum. S.E. v. Czech Republic Ministry of Health*, 907 F.3d 606, 611–12 (D.C. Cir. 2018)). Thus, under Guatemala's own reasoning, a stay would only delay rather than further "the expeditious resolution" of this dispute. *Stileks*, 985 F.3d at 879 (quoting *Europcar*, 156 F.3d at 317–18). So this factor weighs against a stay.

### ii. The Status of the Foreign Proceedings and the Estimated Time for those Proceedings to be Resolved

The second *Europcar* factor—the status and estimated time for the proceedings to be resolved—also does not support a stay. *Stileks*, 985 F.3d at 880. Guatemala has not yet demonstrated a "high probability" that the award (if binding) would be overturned beyond the fact

---

[6] The Parties disagree on the proper methodology to determine whether an arbitral award is binding. Mot. 7, 17; Opp'n 28. The Court need not resolve that dispute at this time. But it notes that in making that determination, courts have looked to the terms of the arbitration agreement, *Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 22 (D.D.C. 2011), "the law of the rendering jurisdiction," *Diag Hum. S.E. v. Czech Republic Ministry of Health*, 907 F.3d 606, 611 (D.C. Cir. 2018), and the appealability of the award, *Compañia de Inversiones Mercantiles*, 970 F.3d at 1298 (citing *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys.*, 665 F.3d 1091, 1100–01 (9th Cir. 2011)). *See also* Panama Convention, art. 4 (providing for the enforcement of "[a]n arbitral decision or award that is not appealable under the applicable law or procedural rules").

that the Constitutional Court stayed the Guatemalan confirmation judgment. *Id.* And the D.C. Circuit has held that even a remand from an appellate court is not enough to find a "fair probability" of reversal of an arbitral judgment under this factor. *Id.* Furthermore, following a decision of the Guatemala Supreme Court in the *Amparo* proceeding, Guatemala estimates that a further appeal to the Constitutional Court would take an additional year. Mot. 11. And should Guatemala succeed, the case could still be remanded for further proceedings, and Guatemala has indicated its intent to seek a stay of the Guatemala proceedings altogether throughout the duration of an indefinite criminal investigation into Sigma. Mot. 24. Guatemala's request for a stay in this proceeding would encompass this entire period if it were to prevail in its *Amparo* action. *See* Mot. 15–16. And the Convention disfavors stays that are "years rather than days away." Far Eastern Shipping Co. v. AKP Sovcomflot [1995] EWHC (Comm) 1 Lloyd's Rep. 520; *see also Stabil LLC v. Russian Fed'n*, No. 22-cv-983, 2024 WL 5093202, at *6 (D.D.C. Dec. 12, 2024) ("[C]onfirmation petitions are meant to be 'summary' proceedings, not multi-year slugfests." (quoting *Argentine Republic v. Nat'l Grid PLC*, 637 F.3d 365, 369 (D.C. Cir. 2011))). Undoubtedly, this factor disfavors a stay.

### iii.    Whether the Award Sought to be Enforced Will Receive Greater Scrutiny in the Foreign Proceedings under a Less Deferential Standard of Review

The third *Europcar* factor is whether the Guatemalan proceeding will offer greater scrutiny of the arbitral award than this proceeding. *Stileks*, 985 F.3d at 880. Guatemala argues, in part, that Guatemalan courts have more flexibility than this Court to scrutinize its corruption allegations underlying its potential efforts to set aside the judgement as against public policy. Reply 15. Meanwhile, Sigma argues that this factor is in equipoise because many of the arguments it is making in Guatemala are available in this proceeding as well. Opp'n 33–34.

Indeed, the Convention was largely acceded to based on an understanding that it provides parties with a "full opportunity to place all reasonable agruments [sic] before the courts of the country of enforcement" and that "the grounds specified for denial of enforcement are largely the same as the grounds for annulment specified in the national laws of most countries." *1958 State Department Delegation Report*, 19 Am. Rev. Int'l Arb. at 108. So "the Convention necessarily envisions multiple" and "concurrent enforcement and annulment actions" across nations to "address the same substantive challenges to an arbitral award." *Karaha Bodas*, 335 F.3d at 367. And confirmation is premised on "the willingness of national courts to let go of matters they normally would think of as their own." *Mitsubishi Motors*, 473 U.S. at 639 n.21.

Nevertheless, it is true that as a matter of U.S. law "[t]he public policy defense" under Article V(2)(b) of the Convention "is to be construed narrowly to be applied only where enforcement would violate the . . . most basic notions of morality and justice." *Tatneft v. Ukraine*, 21 F.4th 829, 837 (D.C. Cir. 2021) (citation omitted). "[A]llegations of corruption . . . in connection with the underlying transaction" could "in a given case" present "circumstances" so egregious that it "would justify a court refusing to give effect to an award on the basis of public policy." Restatement (Third) U.S. Law of Int'l Comm. Arb. § 4.16 rep. note d (2023). But the party opposing confirmation faces a "substantial burden" to reach this high bar. *BCB Holdings Ltd. v. Gov't of Belize*, 110 F. Supp. 3d 233, 250 (D.D.C. 2015).

"In contrast to the limited authority of secondary-jurisdiction courts to review the arbitral award, courts of primary jurisdiction," like those of Guatemala here, do "have much broader discretion to set aside an award." *Karaha Bodas*, 335 F.3d at 368. Nevertheless, even though a confirmation "action is ordinarily a summary proceeding" requiring little fact-finding, this Court may also "order discovery or hold an evidentiary hearing to the extent necessary to determine

disputed issues of material fact relevant to" a defense in "the post-award action." Restatement (Third) U.S. Law of Int'l Comm. Arb. § 4.31 (2023). And Guatemala has filed a Declaration noting that some of the documents related to the Sigma corruption investigations have now been unsealed. *See* Gutiérrez Decl., ECF No. 22. At this stage of proceedings, where Guatemala has not yet briefed its defenses on the merits, it is too early to decide whether this Court can fairly weigh Guatemala's defenses and any relevant evidence. Accordingly, this factor provides no reason to stay the proceedings before further briefing and possibly hearings can be held on the issue.

### iv.    The Characteristics of the Foreign Proceeding

The fourth *Europcar* factor—the characteristics of the Guatemalan proceedings—is in equipoise. *See Stileks*, 985 F.3d at 880. The *Revisión* proceeding was brought "to set the award aside" which "tend[s] to weigh in favor of enforcement" as opposed to a stay. *Id.* The proceeding was "initiated before the underlying enforcement proceeding," which favors a stay and raises concerns of "international comity." *Id.* Indeed, Guatemala relies heavily on its comity interests in its judicial proceedings to support its request for a stay. Mot. 21–22. But such "principle[s] of international comity" must be "balance[d] [against] the Convention's policy favoring confirmation of arbitral awards." *Stileks*, 985 F.3d at 880 (citation omitted). Sigma is "the party [] seeking to enforce" the arbitral award and initiated this proceeding, which disfavors a stay. *Id.* Finally, Sigma suggests that Guatemala's various attempts to stay the foreign proceedings "indicat[e] an intent to hinder or delay resolution of the dispute." *Id.* Indeed, Article VI was added to the New York Convention to "discourage[] delaying or obstructive tactics by the losing party in an arbitration." *1958 State Department Delegation Report*, 19 Am. Rev. Int'l Arb. at 113–14. But the Court does not have enough in the record at this stage of proceedings to make any determination on this prong. At bottom, this factor does not weigh in favor of either party.

**v.    The Balance of the Possible Hardships to Each of the Parties**

Sigma has demonstrated possible hardship from continued delay from multiple years of confirmation litigation since the arbitration decision in October 2021. Opp'n 6–12. Such multi-year delays following an arbitral decision generally "weigh[] in favor of immediate enforcement." *G.E. Transp. S.P.A. v. Republic of Albania*, 693 F. Supp. 2d 132, 139 (D.D.C. 2010). Meanwhile, Guatemala argues that it will face hardship because "if this Court confirmed the Award, and then the Guatemalan courts later revoked it, there might be complicated proceedings . . . needed to restore the status quo." Mot. 19. But such concerns are only implicated "when the Parties seek relief on the merits." *Sigma Constructores*, 2025 WL 485403, at *8. At this stage of the proceedings, "the question of a stay is premature. Guatemala's only 'case of hardship or inequity in being required to go forward' is continued litigation." *Id.* (quoting *Landis v. North American Co.*, 299 U.S. 248, 255 (1936)). "Continued litigation is not a hardship that justifies a stay." *Id.*

**vi.    Any Other Circumstances that Could Tend to Shift the Balance in Favor of or Against Adjournment**

The Court does not identify any other circumstances relevant to the stay analysis. *See Stileks*, 985 F.3d at 880 (noting a court need not address all factors).

*    *    *

At this stage of the proceedings, nearly all the factors either weigh against a stay or favor neither party. And the first two *Europcar* factors both weigh against a stay. *See Stileks*, 985 F.3d at 879–80 (citing *Europcar*, 156 F.3d at 317–18). Accordingly, the Court declines to enter a stay at this time. Rather, "[t]he appropriate time to consider the merits of a stay may be when the Parties seek relief on the merits of the Petition. At that point, the status of proceedings in Guatemala may have changed." *Sigma Constructores*, 2025 WL 485403, at *8.

## 2.    Inherent Authority

Guatemala also asks this Court to stay this case under its inherent authority. Mot. 19. Normally, a court has "broad discretion to stay proceedings as an incident to its [inherent] power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706 (1997). But courts are wary to exercise inherent authority when doing so conflicts with a "limitation on the district court's power contained in a rule or statute." *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016). And the FAA only permits "deferral" of a Convention enforcement proceeding, *e.g.*, a stay, in a manner "specified in the . . . Convention." 9 U.S.C. § 207. So the Court's inherent authority to issue a stay on non-Convention grounds is suspect. *See Dietz*, 579 U.S. at 45. The Restatement takes the position that such a stay may be appropriate when "two courts within the same competent jurisdiction" are hearing an issue but not when "an action for the same post-award relief is already pending in a court of another country." Restatement (Third) U.S. Law of Int'l Comm. Arb. § 4.27, rep. note e (2023); *see also Hewlett-Packard Co. v. Berg*, 61 F.3d 101, 106 (1st Cir. 1995) ("Congress did not intend a major departure from the ordinary rule allowing one federal court to stay litigation when another federal court is on the process of deciding the same issue." (cleaned up)).

Regardless, the D.C. Circuit has rejected the use of inherent authority to stay an arbitration award throughout the pendency of a foreign appeal because such a stay is "of indefinite duration" and not "susceptible of prevision and description." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 732 (D.C. Cir. 2012) (quoting *Landis*, 299 U.S. at 255, 257). The Circuit reasoned that such a stay would be appropriate only upon a showing of "pressing need." *Id.*

Here, Guatemala's request to stay confirmation until the "resolution" of the Guatemalan judicial proceedings has the "legal effect of preventing [Sigma] from proceeding with [its] claims in federal court for an indefinite period of time, potentially for years." *Id.* (quoting *King v. Cessna*

*Aircraft Co.*, 505 F.3d 1160, 1169 (11th Cir. 2007)). Indeed, Guatemala has already had difficulty estimating the length of the *Amparo* proceedings. Guatemala initially predicted the Supreme Court would render a decision by the end of 2025 but, to the best of the Court's knowledge, those proceedings are still ongoing. *See* Mot. 24. And even if that decision is issued promptly, Guatemala recognizes that further judicial proceedings and a potential indefinite stay pending a criminal investigation is possible. *Id.* As discussed earlier, Guatemala has not demonstrated a "pressing need" for such an "indefinite" stay prior to merits briefing in this case. *Id.* at 25. Guatemala's "hardship or inequity in being required to go forward" at this stage of proceedings is only "continued litigation" and that "hardship" does not "justif[y] a stay." *Sigma Constructores*, 2025 WL 485403, at *8 (cleaned up). Accordingly, even if this Court could grant a stay under its inherent authority, Guatemala has failed to show that one should be granted.

The Court thus denies Guatemala's motion for a stay without prejudice. Guatemala may move for a stay at a later stage of the proceedings.

### C.    Forum Non Conveniens

Guatemala also asks this Court to dismiss this action under the *forum non conveniens* doctrine. Mot. 29. But "binding circuit precedent dictates that *forum non conveniens* is not available in proceedings to confirm a foreign arbitral award because only U.S. courts can attach foreign commercial assets found within the United States." *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088, 1105 (D.C. Cir. 2024) (cleaned up). Because "no adequate alternative forum outside the U.S. exists," the doctrine is unavailable "even if the defendant 'currently has no attachable property in the United States, [as] it may own property here in the future.'" *Tatneft*, 21 F.4th at 840 (quoting *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 303 (D.C. Cir. 2005)) (alteration in original).

Guatemala attempts to distinguish this line of cases by pointing to the absence of D.C. Circuit precedent involving an "arbitration award that is purely domestic to a single foreign state," as is the case here. Mot. 28. But the D.C. Circuit's rationale centered on the forum court's ability "to attach assets located in the U.S." and not "the locus of . . . the controversy" or arbitral award. *Tatneft*, 21 F.4th at 840–41. "[T]he whole point is to enforce awards against assets in jurisdictions other than where the underlying dispute arose." *Deutsche Telekom*, 155 F.4th at 700. So that argument is unavailing.

Guatemala also relies on a single decision of a court in this District, *TermoRio S.A. E.S.P. v. Electrificadora Del Atlantico S.A. E.S.P.*, 421 F. Supp. 2d 87, 103 (D.D.C. 2006), that applied *forum non conveniens* to a Convention award notwithstanding this Circuit's jurisprudence and was ultimately affirmed by the D.C. Circuit on an alternate basis, *TermoRio*, 487 F.3d at 932 ("[W]e find it unnecessary to determine whether the case might have been dismissed on the ground of *forum non conveniens*, the alternative basis announced by the District Court."). But the D.C. Circuit has since then repeatedly re-affirmed the inapplicability of *forum non conveniens* in Convention enforcement proceedings. *See Stileks*, 985 F.3d at 876 n.1; *Tatneft*, 21 F.4th at 840–41; *NextEra*, 112 F.4th at 1105; *Deutsche Telekom*, 155 F.4th at 700. And such decisions are "binding . . . unlike an 'in the alternative' decision rendered by another judge of this court that was not affirmed (or even considered) on appeal." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 5 F. Supp. 3d 25, 34 n.9 (D.D.C. 2013), *aff'd*, 794 F.3d 99 (D.C. Cir. 2015) (cleaned up). So this Court cannot dismiss for *forum non conveniens*.

The Court recognizes that the D.C. Circuit's *forum non conveniens* jurisprudence is in direct conflict with that of the Second Circuit. *See Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384, 392–93 (2d Cir. 2011) (Panama Convention); *In re Arb.*

between *Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 494–96 (2d Cir. 2002) (New York Convention). But the D.C. Circuit has rejected efforts to reconsider its approach in light of this split. *See Tatneft*, 21 F.4th at 840–41. And the Supreme Court recently declined an invitation to address the question. *See Antrix*, 605 U.S. at 237. Nevertheless, the Restatement has endorsed this Circuit's approach over that of the Second Circuit. Restatement (Third) U.S. Law of Int'l Comm. Arb. § 4.27(a) (2023). And the Second Circuit's jurisprudence has received criticism from even within that Circuit. *See Figueiredo*, 665 F.3d at 398–99 (Lynch, J., dissenting) ("[T]here are substantial reasons to think that *Monegasque* was wrongly decided.").

The Second Circuit's approach is based on the Convention's requirement that awards be enforced in accordance with domestic "procedure." New York Convention, art. III; Panama Convention, art. 4. So the Second Circuit reasons that *forum non conviens* remains available under the Convention as "a doctrine of procedure." *Figueiredo*, 665 F.3d at 392 (cleaned up). The issue with this approach is that the entire point of the Convention is to prevent courts from "declin[ing] enforcement of [arbitral] agreements on the basis of parochial views of their desirability or in a manner that would diminish the mutually binding nature of the agreements." *GE Energy*, 590 U.S. at 442 (citation omitted); *see also Deutsche Telekom*, 155 F.4th at 700 ("[T]he whole point is to enforce awards against assets in jurisdictions other than where the underlying dispute arose."). And the "parochial refusal by the courts of one country to enforce an international arbitration agreement would not only frustrate these purposes, but would invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages." *Scherk*, 417 U.S. at 516–17.

Indeed, the point of the procedure provision is to prevent countries from "maintain[ing] procedures for the enforcement of foreign awards that [a]re substantially more onerous than those

that appl[y] to domestic awards." *Figueiredo*, 665 F.3d at 395–96 (Lynch, J., dissenting). But the doctrine of *forum non conveniens* is just that—a bar to enforcing foreign awards based on a preference for "having localized controversies decided at home." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 260 (1981) (citation omitted). This runs contrary to the Convention's encouragement of "national courts to let go of matters they normally would think of as their own." *Mitsubishi Motors*, 473 U.S. at 639 n.21.

Moreover, most State Parties to the Convention would not consider *forum non conveniens* to be a "procedural rule" because "civil-law jurisdictions generally do not embrace the forum non conveniens doctrine." Restatement (Third) U.S. Law of Int'l Comm. Arb. § 4.27 rep. note a(ii) (2023). For most nations, procedure only governs "*how* litigation shall proceed, but [not] *whether* it shall proceed." *Id.* (emphasis in original). So a doctrine that "regulates access to the courts" would not likely be considered a "rule[] of procedure" to most State Parties. *Id.*

"Because a treaty ratified by the United States is not only the law of this land but also an agreement among sovereign powers," courts generally "give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties." *El Al Israel Airlines v. Tsui Yuan Tseng*, 525 U.S. 155, 167 (1999) (cleaned up). Thus, it is argued that the Second Circuit's use of *forum non conveniens* in international arbitral disputes "places the United States in breach of its treaty obligations" because other State Parties would not consider such a dismissal to be procedural within the meaning of the Convention. *Figueiredo*, 665 F.3d at 399 (Lynch, J., dissenting).

Regardless, in this Circuit, Guatemala cannot rely on *forum non conveniens* to avoid the enforcement of Sigma's arbitral award. *See NextEra*, 112 F.4th at 1105. So the Court will not dismiss this action on that ground either.

**CONCLUSION**

For the foregoing reasons, the Court denies Guatemala's motion to dismiss or, in the alternative, to stay, ECF No. 15. The Court will follow with a briefing schedule that provides for an expeditious resolution of this matter "in the nature of federal motion practice." *TermoRio*, 487 F.3d at 940 (quoting 3 Fed. Proc., L. Ed. § 4:183 (1999)).

A separate order will issue.

 

 

_____

SPARKLE L. SOOKNANAN
United States District Judge

Date:   February 10, 2026